

Not Reported in P.3d                                                                                                                                                              Page 1
Not Reported in P.3d, 121 Wash.App. 1011, 2004 WL 831458 (Wash.App. Div. 1)
**(Cite as: 2004 WL 831458 (Wash.App. Div. 1))**

NOTE: UNPUBLISHED OPINION, SEE RCWA 2.06.040

Court of Appeals of Washington,
Division 1.
Maria Toni MONROE and Richard Monroe, wife and husband and the marital
community comprised thereof, Appellants,
v.
SAFEWAY, INC., a foreign corporation doing business in Washington, Respondent.
**No. 52516-6-I.**

April 19, 2004.

Appeal from Superior Court of King County; Hon. Glenna S. Hall.

Ralph Glenn Phillips, Phillips & Webster PLLC, Woodinville, WA, for Appellant.

Keith Alan Bolton, Bolton & Carey, Seattle, WA, for Respondent.

UNPUBLISHED OPINION

ELLINGTON, J.

**\*1** Toni Monroe slipped on a small puddle in the dairy aisle of a Safeway store. Her suit against Safeway was dismissed on summary judgment. We conclude there is no genuine issue of material fact as to whether Safeway caused or had notice of the spilled substance, or whether Safeway's housekeeping measures were inadequate in light of the risk of spills in the dairy aisle, and therefore affirm.

BACKGROUND

Toni Monroe filed a personal injury action against Safeway, after she slipped on a clear to white substance while shopping in the dairy aisle. Monroe did not see any foreign substance on the floor before she slipped, but afterward observed a colorless liquid that felt like egg white. Monroe had no information as to how the substance came to be on the floor. Safeway's dairy manager, Andy Emerson, was stocking the dairy aisle with his back toward the orange juice shelves when he heard a woman say 'Whoa.' Clerk's Papers at 10. He turned around and saw Monroe, who told him she had just slipped. Emerson checked the floor and saw a silver dollar-sized spot on the floor that looked like orange juice. Emerson inspected the area and saw nothing else on the floor. He checked and found that none of the orange juice containers were leaking. Less than 20 minutes earlier, Emerson had pushed a six-wheeler cart from the back of the store to stock products, and had checked the floor. At that time, there was no liquid or foreign substance on the floor.

Emerson later testified that milk is spilled on average once a day on the dairy aisle, and eggs occasionally leak during restocking or when customers open cartons containing a broken egg. The aisle floor is cleaned thoroughly before 10 a.m. every day, and Emerson checks the aisle for spills whenever he is on the floor. Store policy requires employees to clean up any spills they discover, although this policy is unwritten. Safeway also employs 'courtesy clerks,' who seek out spills throughout the store with mop, bucket, and warning cones in hand, five to eight times per day. The store maintains no records of the frequency with which the dairy aisle is inspected.

The trial court granted Safeway's motion for summary judgment.

DISCUSSION

We apply the usual standard for review of summary judgment. CR 56(c); Anderson v. State Farm Ins. Co., 101 Wn.App. 323, 329, 2 P.3d 1029 (2000). Generally, a premises owner is not liable to a business invitee for an unsafe condition caused by another unless the owner knew or should have known of the unsafe condition. Ingersoll v. DeBartolo, Inc., 123 Wn.2d 649, 652, 869 P.2d 1014 (1994). Monroe makes two arguments. She contends the evidence raises a question of fact as to whether Safeway caused or had notice of the puddle in which she slipped. She also contends that she need not show such notice, because the unsafe condition was a reasonably foreseeable consequence of Safeway's self-service operation.

As to notice, Monroe relies on Emerson's testimony that the restocking process, which involves moving products on a large, six-wheeled cart, occasionally results in spills and debris on the floor. Because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d                                                                                                                          Page 2
Not Reported in P.3d, 121 Wash.App. 1011, 2004 WL 831458 (Wash.App. Div. 1)
**(Cite as: 2004 WL 831458 (Wash.App. Div. 1))**

Emerson had wheeled the cart into the aisle 20 minutes before Monroe slipped, she contends that a jury could infer Emerson caused or should have known about the spill. But the record does not support this theory.

**\*2** Emerson testified that spills occur during restocking as a result of moving products from the cart to the shelf, not from wheeling the cart down the aisle. At the time of Monroe's fall, Emerson was stocking cheese. While it is conceivable that a leaky carton of orange juice left liquid on the cart during the morning, it was several hours later when Emerson used the cart for cheese, so there is no basis for a finding that the cart was the source of the foreign substance. In addition, the floor had been thoroughly cleaned after orange juice was stocked for the day, and Emerson had personally inspected the dairy aisle floor twice within the hour before Monroe slipped, and the floor was clean at that time.

Based upon this evidence, we agree with the trial court that Monroe failed to raise a genuine issue of material fact as to whether Safeway caused or had notice of the hazard from the spilled substance. For her second argument, Monroe relies upon a narrow exception to the requirement that a plaintiff show notice of the unsafe condition. This exception applies in self-service operations 'when the nature of the proprietor's business and his methods of operation are such that the existence of unsafe conditions on the premises is reasonably foreseeable.' _Pimentel v. Roundup Co.,_ 100 Wn.2d 39, 49, 666 P.2d 888 (1983). In that situation, a proprietor is considered to be on constant notice that spills and hazards will occur in the ordinary course of business. _Wiltse v. Albertson's Inc.,_ 116 Wn.2d 452, 461, 805 P.2d 793 (1991).

Accordingly, the plaintiff need not show notice, but may establish liability by showing that the operator of the premises failed to conduct periodic inspections with the frequency required by the foreseeability of the risk. _Id._

The Pimentel exception is limited to hazards that are directly related to the store's self-service mode of operation. _Wiltse,_ 116 Wn.2d at 461. The fact that an injury occurs in a self-service area does not implicate the Pimentel exception unless the unsafe condition causing the injury is 'continuous or foreseeably inherent in the nature of the business or mode of operation.' _Ingersoll,_ 123 Wn.2d at 653 (citing _Wiltse,_ 116 Wn.2d at 461). A plaintiff must therefore present evidence that the unsafe condition in the location of the accident was reasonably foreseeable. _Arment v. K-Mart Corp.,_ 79 Wn.App. 694, 698, 902 P.2d 1254 (1995). It is undisputed that Safeway's dairy aisle is a self-service area. Milk is spilled on average once a day, while other products spill less frequently. Eggs, for example, are spilled less than twice per week. Emerson estimated he had observed orange juice on the floor only 10 to 12 times in the 13 years he had worked at Safeway. But Emerson acknowledged that more spills occur in the dairy aisle than in the dry goods areas. Assuming a fact question exists about the foreseeability of spills in the dairy aisle, the issue is whether Safeway failed to use reasonable care to prevent the injury by conducting periodic inspections with the frequency required by the foreseeability of the risk. See _Wiltse,_ 116 Wn.2d at 461; _O'Donnell v. Zupan Enters. Inc.,_ 107 Wn.App. 854, 860, 28 P.3d 799 (2001).

**\*3** Reasonable care requires a proprietor to 'inspect for dangerous conditions and provide such repair, safeguards, or warning as may be reasonably necessary to protect its customers under the circumstances.' _O'Donnell,_ 107 Wn.App. at 860 (citing _Iwai v. State,_ 129 Wn.2d 84, 96, 915 P.2d 1089 (1996)). The self-serve mode of operation may require precautions that would not be necessary in other parts of the store, 'such as installing special types of flooring or implementing housekeeping or inspection procedures that reduce the risk of harm and enable the proprietor to discover and remove hazardous conditions customers create.' _Id._ (citing _Ciminski v. Finn Corp.,_ 13 Wn.App. 815, 820, 537 P.2d 850 (1975)). In O'Donnell, a grocery shopper slipped on a piece of lettuce in the check-out aisle, where shoppers were responsible for unloading their own carts. 107 Wn.App. at 856. The plaintiff established the store was aware that grocery items sometimes fell on the floor in that area and posed a potential hazard, and that 'despite a policy requiring all store personnel to remove any debris on the floor, few store employees could actually see into the check-out aisles to ensure they were safe and, despite a policy requiring hourly checks, the employees followed no set cleaning or inspection schedule.' _Id. at 860-61._ The court held there was a genuine issue of material fact as to whether the store exercised due care to prevent injuries caused by items dropped in its check-out area.

Monroe contends the facts here are similar, and that, given the lack of a written policy or a daily log of inspections, a factual question remains as to whether Safeway's cleaning policies really existed or were enforced. Unlike the plaintiff in O'Donnell, however,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d  Page 3
Not Reported in P.3d, 121 Wash.App. 1011, 2004 WL 831458 (Wash.App. Div. 1)
**(Cite as: 2004 WL 831458 (Wash.App. Div. 1))**

Monroe presents no such evidence. But even if a question remained about the existence or execution of the general cleaning policy, Emerson personally inspected the dairy aisle floor only 20 minutes before her slip. Monroe does not carry the burden of raising a question of fact as to the reasonableness of a 20-minute interval between inspections.

Affirmed.

Not Reported in P.3d, 121 Wash.App. 1011, 2004 WL 831458 (Wash.App. Div. 1)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.